GeeeN J.
delivered the opinion of the court.
The bill charges that Peter Akers, of the county of Mau-.ry, departed this life on the 15th of September, 1834, leaving a considerable property; that he had no wife, and that Elizabeth, the wife of the defendant, Charles V. Brown, was his only child. Peter Akers, before his death, on the 26th of August, 1834, executed a will, by which he devised his property to the complainants, who are children of the defendants, Charles and Elizabeth Brown. The bill charges that the defendant, Elizabeth Brown, got possession of the said will immediately after the death of her father, and that she and her husband, Charles V. Brown, have suppressed or destroyed it, so that it cannot now be found. The answer of Charles V. Brown denies any knowledge of the existence of a will, or that he had any agency in its destruction.
The answer of Elizabeth Brown, admits that she knew her father had made a will, and that its contents were such as stated in the bill; but she denies that she ever saw the will, or that she had any agency in its destruction. She states her father had changed his mind relative to the disposition of his property before his death, and that she believes he had destroyed said will himself, for that he told her the morning before he died, that he had given out selling his property, as *89 be had intended, and that she must do the best “she could ... ■with the things, and that she thought that was his will. admits that the provision he had made*for her m the written "will was not satisfactory; admits that she had said, she had her father’s will, but that when she said so, she meant the direction he gave to her to do the best she could with the things. The proof is clear and satisfactory, that Akers made a will a short time before his death. Bryant, a witness, proves that he wrote the will for the old man, and that after its execution he subscribed his name as a witness. Richardson, another witness, proves that only five days before his death Akers came to his house and requested him to witness his will; that he looked at the paper and saw that it was a will; that Bryant’s name was to it as a witness, and that he also subscribed his name as a witness, and that Akers said he intended to get several other witnesses, to prevent any difficulty.
Although it is thus clearly established that the will was in existence, only five days before the testator’s death, yet, as Akers kept the will in his own possession, the fact that it could not be found after his death, in the absence of all proof, would raise the presumption that he destroyed the will himself. 3 Stark. 1715: 3 Phill. 128. And as the bill charges the defendants with its destruction, which they, in their answers positively deny, the rule is, that the answers must be disproved by two witnesses, or by one witness and circumstances. Fonb. 647, (n): 5 Yer. 452: 7 Yer. 155. According to these principles we will examine the facts of the ease. And here it may be remarked, that the evidence abundantly establishes that every consideration of prudence, of feeling, and of duty, existed in the case, to induce the old man to make a will, and to make such an one as the witnesses prove he executed. Brown, his son-in-law, was a profligate drunkard, who had wasted his own property, until he had become utterly insolvent, so that the old man had taken his daughter and her children to iive with him. If he died intestate, his estate would pass into the hands of a man whose confirmed habits would ensure that it would be speedily squandered away, without being of any service to the nu *90 merous family of grandchildren, for whom the old man had felt so modi solicitude, that for years before his death he always kept a will, making in substance the same provisions with the last one; and that he executed a new one-with the view only of making provision for such children of his daughter as were born after the execution of the former ones. With all these considerations pressing upon him he could have had no motive for its destruction. On the contrary, Brown and his wife had a powerful motive for its destruction. ' He would naturally desire to obtain the property as the means of gratifying his beastly appetites, and his wife, unfortunately, seems to have been but two much under the influence of her husband.
She was, as she admits in her answer, dissatisfied with the provision which was made for her in the will. Add (o these considerations the fact, that the old man’s keys were in her possession, and all his papers were in the power of herself and husband, so that if a will was in existence at the old man’s death, it would fall into their, hands; and as its destruction would affect the rights of no one, except their own infant children, the temptation to suppress it was not easily to be resisted.
In addition to these considerations, the evidence does satisfactorily show that the defendants have in fact suppressed or destroyed the will.
The only difficulty is, whether the proof is such as is required by the rule of evidence before stated. We think it is. Amos Richardson proves, that he was at the house of Mr. Akers, the morning after he died, and that when he started home, Mrs. Brown followed him to the gate, and asked him what she was to do about the way her father had left his estate. He asked her where was the will, and she replied, “In the house.” Now this witness’ testimony is in direct contradiction to Mrs. Brown’s answer. It proves her knowledge of the existence of the will, after her father’s death. The force of this evidence is attempted to be obviated in Mrs. Brown’s answer. She says there, that it was true she had told several persons that she had her father’s will, but that she thereby meant the-conversation in which he *91 told her to do the best she could with the things. This # ° statement in the answer is wholly inconsistent with the J ... versation with Richardson. She addressed him with evident concern, and manifested dissatisfaction at the manner her father had left his estate. She followed him to the gate, and asked him what she was to do about it. Would she have felt this solicitude had she supposed there was no other will than the simple direction to her, to do the best she could with the things? Surely she would not, for in that case the property would be left just as she wished it. Besides, she said to Richardson, that the will was in the house. Now, of the words her father had uttered to her, this was untrue. But of the written will it might be perfectly true; therefore, it must have been of the written will she was speaking.
Without going further, we might stop here with the per» feet conviction, not only that the will was in existence at the old man’s death, but that it is satisfactorily proved by one witness and corroborating circumstances. Her statement to Richardson, “that the will was in the house,” is in direct contradiction to her denial of any knowledge of it in the answer. He is then a witness disproving the answer. But her acknowledgment in the answer, that “she had frequently said she had her father’s will,” is evidence of the highest character, that it was in fact in her possession. True, knowing this admission would be proved, she attempts in her answer to give it a different meaning than the true one. No one can believe the meaning she ascribes to the admission, is the one that was in her mind when she made it. In the first place, such meaning would be manifestly nonsensical; and in the next place, Richardson proves she could not have had that meaning. What is the consequence? that we must believe the explanation, as well as take the admission? Not at all. We deduce evidence from an answer in the same way, and under the same rules that we receive proof of the confession of a party. Although that is subject to many suspicions to which admissions in an answer are not liable, still we give that which makes against a party its full force, and if that which is in his favor be unreasonable in itself, or be disproved by other witnesses, or be inconsistent with other *92 facts in the cause, we reject it altogether. Apply this prin-cipie and reject this unreasonable explanation oí hers, inconsistent a3 it is with her solicitude, the morning after his death, as to the way her father had left his estate, and disproved as it is by Richardson, and you have the unqualified admission in her answer, that she had frequently said she had her father’s will. It is true the discovery which is sought from her in the bill makes her a witness, but it does not follow that every thing she may state in her answer is necessarily to be believed. The credit due to her answer is no greater than that which is due to the deposition of a witness. If then she contradicts herself, if she state things which are unreasonable, or if she be contradicted as to material facts by other witnesses, so that her credit as a witness is wholly destioyed, it does not follow that the court must act upon her statement, although there may not be two witnesses contradicting her.
In addition to this proof, of a direct character, showing that the will was actually in existence at the time of the old man’s death, there are many circumstances in the evidence tending to prove Akers could not have destroyed the will himself. The profligate habits and insolvent circumstances of Brown have been before noticed. The proof shows, that in addition to the motives of prudence, to keep his property out of the hands of such a man, and the natural wish to provide for his grandchildren, which would'not be done if he died intestate, he had a strong personal dislike to Brown. One of the witnesses saw him with a bruised eye, and he said Brown had struck him there with a waggon whip. These considerations excited in him a strong determination to exclude Brown from the enjoymeut of any of his property. This resolution he had expressed to many witnesses. The proof is, that he was a man of steady,, determined character, such as would be likely to carry out his purposes. In pursuance of this resolution, for years before his death, he kept a will by him, and only destroyed the preceding one when he had executed the new one. Aged and feeble as he was, yet he hobbled over to his neighbour Richardson’s, only five days before his death, in order to get him to witness his will. Brown was so conscious of his unworthy conduct, and the *93 opinion. that these circum-old man’s dislike to him, that he said to the attendants around the old man’s sick bed, (hat he hated to go where he was, for he looked angry at him. So careful was he of his papers, that he kept,his keys in his hand under the cover of his bed, until the evening ho died, when, he drew out his hand and gave the keys to one of his grand daughters, who gave them to her mother. His aversion to Brown was only equalled by his love and solicitude for his grand children, for whom he had provided in his will. He said to one of the witnesses the day he died, that he was willing to die, but he hated parting with those little children. In the face of all these facts* facts showing an aversion to Brown on his dying bed, and an attachment to the children, that made him in the very hour of dissolution cling to life for their sake; and having taken great pains only five days before to make a will which would gratify all these feelings, is it to be believed that he had himself destroyed it. No one can ' believe it. If he did not destroy it, the conclusion is inevitable, that Brown and his wife did. " We are therefore of stances are sufficient to establish the fact, that the will was in existence at the time of the old man’s death; and that if proof in addition to the evidence of Richardson and the admission of Mrs. Brown’s answer were wanting, it would be found in these facts. The spoliation and suppression of this will, as the court thinks, having been satisfactorily established, the jurisdiction of a court of chancery to set it up and to decree the legacies is unquestionable.
The decree of the chancery court will be reversed, and this court, proceeding to render such decree as the chancery court should have made, order and adjudge, that the will of Peter Akers, deceased, dated 20th of August, 1834, as its terms are stated in the deposition of Bryant, be set up and established, and that the executors therein named be allowed to qualify and take out letters testamentary thereon, to the end that the trust reposed in them be executed, and that the cause be remanded to the chancery court at Columbia, to be further proceeded in as to equity may belongs
Decree reversed-